# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| ) | **08 CV 5589** |
| vs. ) | **(00 CR 1065)** |
| ) | |
| ) | |
| PETER PALIVOS ) | |

## OPINION AND ORDER

Peter Palivos has filed a motion under 28 U.S.C. § 2255 attacking his judgment of conviction of one count of conspiracy to obstruct justice entered in this court on November 2, 2005, case number 00 CR 1065-5. The judgment was affirmed on April 10, 2007. *United States* v. *Palivos*, 486 F.3d 250 (7th Cir. 2007).[1] The 2255 motion was timely filed on September 30, 2008, and an amended motion was filed November 11, 2008 ("2255 motion"). Palivos makes two due process claims against the government: (1), the government violated its obligations to disclose exculpatory evidence, and (2), the government suborned perjured testimony at trial. He makes numerous ineffective assistance of counsel claims against the attorneys who represented him at trial. At a minimum, Palivos contends he is entitled to an evidentiary hearing on his motion.

For the following reasons, Palivos's § 2255 motion will be denied.

## LEGAL STANDARDS

Relief under § 2255 "is reserved for extraordinary circumstances." *Hays* v. *United States*, 397 F.3d 564, 566 (7th Cir. 2005) (citations and internal quotation marks omitted). A district court must grant a § 2255 motion to vacate, set aside, or correct a sentence when the petitioner

---

[1] The conviction of codefendant Louis Marin was reversed on appeal.

establishes "that the district court sentenced him in violation of the Constitution or laws of the United States or that the sentence was in excess of the maximum authorized by law or is otherwise subject to collateral attack." *Id*. at 566–67 (citations and internal quotation marks omitted). "The court should grant an evidentiary hearing on a § 2255 motion when the petitioner alleges facts that, if proven, would entitle him to relief." *Koons* v. *United States*, 639 F.3d 348, 355 (7th Cir. 2011), citing *Hutchings,* 618 F.3d at 699 (internal quotation marks and citation omitted). It is proper to deny a § 2255 motion without an evidentiary hearing if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *Cooper* v. *United States*, 378 F.3d 638, 641–42 (7th Cir. 2004) (district court did not abuse its discretion in denying petitioner an evidentiary hearing where petitioner did not provide additional facts or assertions that would warrant a hearing).

On a § 2255 motion, the district court may not reconsider issues that were raised on direct appeal absent changed circumstances. *Varela* v. *United States*, 481 F.3d 932, 935 (7th Cir. 2007) ("A § 2255 motion is 'neither a recapitulation of nor a substitute for a direct appeal.'" (quoting *McCleese* v. *United States*, 75 F.3d 1174, 1177 (7th Cir. 1996)). Claims that were not raised on direct appeal are procedurally defaulted absent a showing of cause and prejudice or actual innocence. *Torzala* v. *United States*, 545 F.3d 517, 522 (7th Cir. 2008) (citing *Bousley* v. *United States*, 523 U.S. 614, 622, 118 S. Ct. 1604, 140 L. Ed. 2d 828 (1998)). An exception, however, applies to ineffective assistance of counsel claims not raised on direct appeal; they are not subject to the cause and prejudice rule. *Massaro* v. *United States*, 538 U.S. 500, 509, 123 S. Ct. 1690, 155 L. Ed. 2d 714 (2003).

## I. Claims of Brady or Giglio Violations

Under *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), the government must disclose evidence favorable to the accused where the evidence is material to guilt or punishment. *Giglio* v. *United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972), confirmed that the rule applies to impeaching evidence as well as evidence of the elements of the crime. *See id.* at 154, 92 S. Ct. at 766 ("When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within [*Brady*].") (internal quotation marks and citation omitted).

The court assumes the reader's familiarity with the facts of the case and does not repeat them in this ruling.[2] Moreover, the legal standards and Palivos's arguments were thoroughly addressed by this court in its ruling on Palivos's motion to disqualify the Assistant United States Attorneys who represented the United States during the prosecution. There the court examined "whether Palivos has demonstrated at least a colorable evidentiary basis for the accusations

---

[2]*See* 486 F.3d at 252:

> Peter Palivos, an attorney, and Louis Marin, a loan broker, were indicted, along with a number of other defendants, for their involvement in a shady 1996 real estate deal. Both were convicted–Marin of assisting in the preparation and presentation of a false tax return and Palivos of conspiracy to obstruct justice– though he was acquitted of obstruction of justice. They appeal their convictions.
>
> The deal involved a complex loan fraud scheme in which the seller of a problem-plagued restaurant, the Waterfalls, in Antioch, Illinois, secretly fronted money to the buyer to finance the sale. The seller, also a defendant in this case, was JACPG, Inc., a private corporation with a small number of shareholders, including Palivos and his brother George Palivos, also a defendant. The buyer was Peter Bouzanis, who had no financial resources, only limited experience in the restaurant business, was a felon, and had a lackluster credit history. Other than that, he seemed perfect.

3

against [AUSA William R. Hogan, Jr.,] that he failed to turn over material evidence to Palivos."
*United States* v. *Palivos*, No. 08 CV 5589, 2010 WL 3190714, at *2 (N.D. Ill. Aug. 12, 2010).
Finding no such basis, the court denied the motion to disqualify. The *Brady* analysis will not be repeated here; rather, the court will examine whether Palivos's reply brief, filed after that ruling, adds any substance to his earlier presentation.

Principally, Palivos argues that at least he is entitled to an evidentiary hearing on his claim. The essence of Palivos's claim is that when cooperating witness Nicholas Black testified before the grand jury (as well as at trial) that he fabricated backdated notes on November 14 or 15, 2000, the government knew the notes must have been created before November 7, 2000. Palivos contends this is true because Black actually gave a 73-page file on the "Waterfalls" transaction containing these notes to another individual involved in the transaction, Peter Bouzanis, on November 7, 2000. Palivos states "on information on belief" that he believes Bouzanis met with the government after November 7 and before he left the United States for Greece on November 14, 2000 and "on information and belief" that during that meeting Bouzanis gave Hogan a copy of the file. At the very latest, Palivos asserts that Hogan received the same file from Bouzanis's Greek lawyer in September 2003.

Palivos urges that the government need not have been persuaded that Bouzanis's information about the time line was true, but if the government had the information at all it was obliged to turn it over because it was potentially exculpatory. Although this is a correct statement of the rule, the court has already concluded that Palivos has no credible evidence that before Black testified Hogan had in his possession a file (with or without the notes) obtained from Bouzanis.[3]

---

3      First, there is no corroboration of anything Bouzanis has to say. There is no independent evidence that Bouzanis met with Black on November 7, 2000. Moreover, Bouzanis's Greek lawyer has not attested that he sent anything to

(continued...)

Nothing contained in the reply brief persuades this court otherwise. Even if Hogan, in addition to Adam Charnes, Deputy Assistant Attorney General at Department of Justice headquarters in Washington (*see* footnote 2, *supra*), received a package from Greece in September 2003 (and there is no authentication of any of the proffered documents supporting that fact), Palivos cannot demonstrate the contents of the package. If an evidentiary hearing were held, only Hogan could testify about any such package because Bouzanis is a fugitive and Palivos has not indicated that he could command the appearance of the Greek attorney in court. Even if the package included a copy of the notes, it would not establish that Bouzanis had them before Black said he fabricated them. Moreover, only Black and Bouzanis could testify about any meeting before Bouzanis left the country, testimony that has not been proffered. Palivos has failed to offer the district court any objective facts outside the trial record that would warrant an evidentiary hearing as to whether the government failed to turn over exculpatory evidence. He has not demonstrated that this court

---

[3](...continued)
> Hogan, much less that he sent a copy of Black's file containing the disputed notes. The purported proof of shipping is unauthenticated and opaque as to the date of delivery or item(s) delivered. Indeed, the letter from Bouzanis's lawyer dated September 8, 2003, implied to be the cover letter for the package, is addressed to Mr. Charnes. The lawyer's letter merely contains a broad denial of Bouzanis's (not Palivos's) guilt, a conclusion resting on no admissible foundation. Palivos in reply is shocked that the government did not turn over during trial a memorandum (Exh. 1 to Gov't Response to Motion for Discovery) reflecting a telephone conversation between Hogan and Bouzanis on September 26, 2003 (during trial), but he does not specify why a memorandum that does not mention Palivos and merely professes the innocence of Bouzanis, who would not become a witness at trial, was material to his defense. Without credible evidence that Hogan had information that Black gave the notes to Bouzanis by November 7, the accusation of prosecutorial misconduct fails.

*Palivos*, 2010 WL 3190714, at *4.

sentenced him in violation of his due process rights under *Brady/Giglio*. Therefore, his claim must be denied.[4]

## II. Claim of Subornation of Perjury

This claim accuses the government of suborning perjury from Small Business Administration Special Agent Thomas Heinzer and from Nicholas Black. The first accusation rests on the foundation of the above argument that the government failed to turn over exculpatory documents. Palivos contends that the government had to know, from the Breggianos package delivered in the summer of 2003, that Bouzanis had the fabricated notes before he left the country on November 14, 2000; that the government also knew, from having served Bouzanis with a grand jury subpoena on November 1, 2000, that Bouzanis was in the United States as late as that date; and despite this knowledge, the prosecutor knowingly allowed Special Agent Heinzer to testify at trial that Bouzanis was in Greece during October, 2000.

At trial, the whereabouts of Bouzanis during October, 2000 did not arise in the context of whether Bouzanis met with Black on or about November 7, 2000. Thomas Breen, Palivos's counsel, asked Heinzer whether he instructed Black on October 20, 2000 not to speak with Bouzanis. Tr. 1403. The prosecutor on redirect referred to that question and asked, "Do you know where Peter Bouzanis was in October of 2000?" Heinzer responded that he did know, that he "believed . . . he was in Europe." Tr. 1414. On recross, Breen rejoined with the "fact" that

---

[4] Palivos also accuses a former Assistant United States Attorney, Eric Wilson, of asking Bouzanis to give a false statement about Palivos in exchange for a sentence of probation, attempting to take Bouzanis's deposition in Greece but cancelling when Bouzanis refused to testify falsely against Palivos; and ordering Bouzanis never to tell anyone that the notes could not have been created on November 14 or 15, 2000. These accusations of extraordinarily unethical conduct against Wilson are based on affidavits signed by Bouzanis dated February and May, 2005, respectively, well before the trial in this matter. *See* Dkt. No. 11-2, Exh. 2 ¶ 9, Exh. 14 ¶¶ 6 & 7. Since the affidavits appear to have been crafted on behalf of (some have said by) Palivos, the court must infer that the documents were available before trial. In any event, since Bouzanis is not available to testify, an evidentiary hearing on this issue would be useless.

Bouzanis did not leave for Europe until November. Heinzer responded, "Do I know that for a fact?" Breen: "Yeah. Weren't you given that information?" Heinzer, "I don't recall." Tr. 1421. Breen may have been alluding to a grand jury subpoena as "the fact."[5]

During closing argument, neither the prosecution nor the defense alluded to Bouzanis's whereabouts during October and November 2000. The fact has little or no significance unless one assumes the truth of Palivos's assertion that Black and Bouzanis met on November 7. More important, the whereabouts of Bouzanis was not material to the guilt of Palivos but, rather, a minor opportunity to impeach the agent's testimony on a collateral matter. *See* 18 U.S.C. § 1621 (it is unlawful under oath to testify to "any material matter which [the witness] does not believe to be true."). The testimony was certainly not perjured and therefore not suborned. *See id.* at § 1622 (forbidding the procuring of another to commit perjury). The argument is meritless.

The second accusation is that the government suborned perjury from Nicholas Black in that the government knew that his testimony about creating the notes on November 14 or 15 was false yet allowed him to testify to it. According to Palivos, they knew because Breggianos sent the file to Hogan and because Bouzanis said so in an affidavit. As with Agent Heinzer, the accusation lacks any credible foundation.

Palivos also insists that the government knew that George Palivos was out of the country during the period November 3 and 14, 2000 when Black said he and George met a number of times. The issue was raised at trial and is not properly reexamined under § 2255. Since this court has already addressed at length in its ruling on Palivos's post trial motion for judgment of

---

[5]Breen may have learned that Bouzanis left for Greece during November from the May 31, 2001, letter from AUSA Eric Wilson to headquarters relating to an effort to extradite Bouzanis. Wilson, in addition to referring to a November 1, 2000 subpoena, also states that after this, "Mr. Bouzanis immediately set to work planning his departure from the United States," and that he obtained a passport in Canada on November 9, and that on November 24 his professor received a message indicating that he had gone to Greece. Dkt. No. 11-3, p. 18 of 31.

acquittal, Case No. 00 CR 1065, Dkt. No. 187 at 5–7, it will only reiterate that the parties stipulated that George Palivos was out of the country during November 3–14; Black was confronted with the inconsistency between his time line of the meetings (which did not include exact dates) and the stipulation; and Black conceded that if George was out of the country during that period he did not meet with him then. Nonetheless, he stuck to his testimony that he did meet with him. The jury chose to believe Black. *See United States* v. *Palivos*, 486 F.3d 250, 254 (7th Cir. 2007) ("Palivos has not shown that Black's testimony is, in fact, false. Black has always maintained that he testified truthfully at trial.").

### IV. Claims of Ineffective Assistance of Counsel

To prevail on a claim of ineffective assistance of counsel, the petitioner must show (1) that counsel's representation fell below an objective standard of reasonableness, and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different. *Strickland* v. *Washington,* 466 U.S. 668, 688, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). The petitioner "bears a heavy burden in making out a winning claim based on ineffective assistance of counsel," *United States* v. *Trevino*, 60 F.3d 333, 338 (7th Cir. 1995), particularly since the *Strickland* test "is highly deferential to counsel, presuming reasonable judgment and declining to second guess strategic choices." *United States* v. *Williams*, 106 F.3d 1362, 1367 (7th Cir. 1997) (internal quotation marks and citation omitted).

To satisfy the first prong of the *Strickland* test, the petitioner must direct the court to specific acts or omissions of his counsel. *Fountain* v. *United States,* 211 F.3d 429, 434 (7th Cir. 2000) (citing *Trevino,* 60 F.3d at 338). The court must then consider whether, in light of all of the circumstances, counsel's performance was outside the range of professionally competent assistance. *Id.* (citing *Trevino,* 60 F.3d at 338). Counsel's performance must be evaluated while

8

remembering that an attorney's trial strategies are a matter of professional judgment and often turn on facts not contained in the trial record. *Id.*

To satisfy the second prong of the *Strickland* test, the plaintiff must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *Id*. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. A court need not address both prongs of the *Strickland* test if one provides the answer; that is, if a court determines that the alleged deficiency did not prejudice the defendant, the court need not consider the first prong. *United States* v. *Fudge*, 325 F.3d 910, 924 (7th Cir. 2003) (citing *Matheney* v. *Anderson*, 253 F.3d 1025, 1042 (7th Cir. 2001)). Where issues have already been or could have been raised at trial, then addressed in post-trial motions and on appeal, recasting them as claims of ineffective assistance will normally be futile. *See Bilzerian* v. *United States*, No. 95 Civ. 1215 & 88 Cr. 962, 1996 WL 524340, at *11 (S.D.N.Y. Sept. 13, 1996); *Grubb* v. *United States*, 859 F. Supp. 227, 228 (S.D. W. Va. 1994) *aff'd as modified*, 65 F.3d 167 (Table) (4th Cir. 1995) (claimed error in sentencing calculation that had been rejected on direct appeal could not be reconsidered under the guise of collateral attack).

Palivos make many charges of ineffective assistance of his trial counsel, Thomas Breen and Todd Pugh. First he argues that counsel were ineffective for failing to call witnesses that would have impeached Nicholas Black. He asserts that Breen's investigator had statements from twenty-four witnesses, some of which Breen apparently did not even read (Palivos discovered reviewing counsel's file that some of the envelopes were unopened). Although Palivos had

access to the file, he does not explain how any of these statements would have caused a jury to reach a different result.[6] This argument is thus rejected.

Palivos argues that counsel failed to discredit Black's testimony about finding old pads and pens for writing the fabricated notes. He proffers that Black's secretary would have testified that Black did not have an old valise under his desk and that Black, in any event, always used up his pens and pads of paper entirely. He also faults counsel for failing to get Black's 2000 calendar during discovery, which he suggests would have demonstrated that the meetings between Black and Palivos did not occur. He proffers several individuals who worked at Palivos's law firm or within the building where the firm was located who could have testified that Black was not seen at Palivos's law office from November 3 to 13, 2000. He contends that counsel failed to call witnesses who would have testified that George Palivos was in Europe during the November 3–15 period at times Black said he was present at the Palivos Law Firm. He believes counsel did not investigate others who should have had copies of the Waterfalls file before November 14, 2000. In particular, he identified his first attorney, Peter Limperis, who, Palivos contends, had copies of the notes on October 23, 2000. According to Palivos, "[t]his evidence would have destroyed the government's case." He also faults counsel for failing to call witnesses who would testify that Palivos was elsewhere than meeting with Black on November 15.

In preparation for its response, the government interviewed Breen and Pugh concerning their representation of Palivos. Breen has attested to the accuracy of Special Agent Heinzer's Interview Memorandum reflecting the attorneys' statements. Dkt. No. 54-8, p. 1 of 7. He

---

[6] In any event, Breen's affidavit states that he read all of the witness interview summaries provided by Palivos or his investigator and that if he left envelopes unopened it was because he had already received and read a faxed copy of the same materials. Dkt. No. 54-8, p. 2 of 7. Palivos is not competent to testify to the contrary.

10

explains his reasons for not calling the many witnesses that Palivos proffered to him to corroborate his own denials. Although considerable detail is contained in the statement, in short, Breen came to believe that Palivos had "kinked up" the putative witnesses such that they would not stand up under cross-examination. *Id*. at p. 2 of 7. With respect to Limperis, Breen interviewed him about the contents of the file at the time he had it during October 2000 and, although Limperis initially indicated that the notes were in the file, he declined when Breen asked him if he would testify to this fact at trial. In fact, Limperis admitted to counsel that he had not even reviewed the file. For this and for other reasons Breen concluded his story "did not make sense."[7] Palivos has no statement from Limperis disputing Breen's statement.

    Palivos launches numerous other attacks on counsel. He argues that they were ineffective for not calling any witness in Palivos's defense to establish that Black had misled others in the deal and that if any misconduct occurred, it was at Black's direction and without Palivos's knowledge. Palivos also faults counsel for failing to call witnesses to establish that Black had previously committed similar fraud by backdating handwritten notes, naming a number of instances where witnesses had accused or witnessed Black fabricating documents and that Black had failed for six unidentified years to file his tax return and gave false information on a loan application. He faults counsel for failure to present evidence that Palivos was not a shareholder

---

[7]Breen stated, inter alia,

> "[I] became familiar with Palivos' distinct writing style, and could tell that witnesses' statements were being prepared by Palivos. [I believe] Limperis's affidavit was also prepared by Palivos, as well as the overview 'script' that Peter Bouzanis provided to government investigators in London, England." . . . "[I] suspected the story was false because the notes were never of issue before the government received them on November 15, 2000. The notes should not have been important to Limperis when he claimed to have seen them; there was no reason for Limperis to recall them specifically years later."

Dkt. No. 54-8, p. 3 of 7.

11

of JACPG and had no motive to hide the details of the transaction. He also claims that counsel's refusal to submit a theory-of-defense jury instruction was ineffective assistance.

Counsel's performance must be evaluated while remembering that an attorney's trial strategies are a matter of professional judgment and often turn on facts not contained in the trial record. Given the totality of the facts and circumstances in this case–and this court is unable to set aside its own observations of Palivos during his persistent post-trial motions, sentencing hearing, and period of supervision–this court is not persuaded that an evidentiary hearing would doing anything more than give Palivos yet one more opportunity to rehash his own denials of the evidence and attempt to rationalize events so as to leave himself out of them. To the contrary, Breen's and Pugh's decisions whether to call the identified witnesses were certainly within the range of sound professional judgment. *See Lema v. United States*, 987 F.2d 48, 54 (1st Cir. 1993) ("The decision whether to call a particular witness is almost always strategic, requiring a balancing of the benefits and risks of the anticipated testimony."). Breen thoroughly cross-examined Black on the material issues surrounding when and whether Black fabricated notes. Had he called the minor witnesses Palivos proposes, it might well have done more harm than good. Had he called certain of the witnesses Palivos proposes, one might reasonably question the soundness of his judgment.

For example, Black's secretary's testimony about Black's old valise and his habits of using pens and paper and the building witnesses would have, at best, cast minor doubt on Black's testimony as to how he came across old paper and pens. None of the witnesses claims to have been present during the incriminating conversations nor to have witnessed Black do or say something inconsistent with his testimony about those conversations. That a number of witnesses did not see Palivos at the Palivos Law Firm or the building where it was located does not

demonstrate that he was not there. Neither does the absence of a notation in Black's calendar lend any force to the non-occurrence of a clandestine meeting. As for George Palivos's absence from the United States during November, 2000, the government stipulated that he was absent. That counsel chose not to call an alibi witness to rebut Black's testimony that he had dinner with Palivos on November 15, an event that was not material to the crime, is well within the zone of reasonable judgment. The lack of testimony from all of these witnesses who could readily be pegged as under Palivos's influence would not undermine a reasonably discerning observer's confidence in the verdict.

The related argument that it was ineffective assistance not to call a witness to impeach Black's statement that he never before done a 100 percent financing deal is hardly an omission justifying a conclusion of ineffective assistance. Breen's counsel disputed that Palivos was a shareholder of JACPG (although no one has suggested who else might have been the P in the acronym). Taken individually or together, these arguments are wholly unpersuasive.[8]

Palivos also takes issue with his counsel's ability to cross-examine. He argues that counsel failed to discredit Black with the timing of his decision to cooperate with the government, as well as that of Black's law partner, Dean Kalamantianos, who was not charged. An argument that counsel did not do enough or ask the questions that in hindsight might have been better will rarely carry the day (Palivos has cited no such case) and certainly not where the record reflects fifty pages of Breen's first cross examination of Black, nine pages of which are devoted to the progression of and reasons for Black's decision, as he put it, "to tell the truth for my family's sake," Tr. 1903, after having previously lied to agents about the transaction. Tr. 1900–1909. Mr.

---

[8]The argument that counsel should have submitted a theory-of-defense instruction consists of three sentences and does not even suggest what instruction might have been given. "[R]emind[ing] the jury that the government could not produce any physical evidence corroborating its story of the old pens, pads and valise" is not an instruction.

Pugh thoroughly cross-examined Kalamantianos about his close relationship with Black, his motivation to support Black, the meetings he had with the agents, and his decision to cooperate. Tr. 2014–2041, 2078–2087. The jury knew that Kalamantianos was not charged with a crime. There is no basis here for a claim of ineffective assistance. *See United States* v. *Jackson*, 546F.3d 801, 814 (7th Cir. 2008) (deciding what questions to ask on cross examination is a matter of strategy) (citations omitted). Nor has Palivos given the court any reason to conclude that had counsel followed Palivos's *post hoc* advice the result would have been different.

Black's prior failure to file tax returns or making a false statement on a loan application might have been inquired into on cross-examination if, within the discretion of the court, it was considered probative of the witness' character for truthfulness or untruthfulness. *Id*. Where Black admitted his untruthfulness in that he fabricated the notes and admitted his purpose to cover his dishonesty in the transaction, the evidence was not impeaching of Black's testimony and therefore not proper cross-examination.

Palivos's conviction rested on Black's credibility. Black was thoroughly cross-examined by very able counsel. Unfortunately for Palivos, the jury believed Black. Palivos's persistent, repeated regurgitation of versions of the same arguments through a succession of attorneys has been and remains futile.[9]

---

[9]To the extent this opinion fails to address any issue in Palivos's lengthy list of misconduct, errors and omissions by the government or his own counsel, the court has considered it and denies it as without merit.

**CONCLUSION AND ORDER**

For the foregoing reasons, Palivos's motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 is denied. The request for an evidentiary hearing is denied.

Dated: September 15 2011

Enter: _____
JOAN HUMPHREY LEFKOW
United States District Judge